NORTHERN PAC. RY. CO. v. UNITED STATES.

Civil Action No. 129.

District Court, D. Minnesota, Third Division.

Dec. 30, 1946.

838

L. B. daPonte and M. L. Countryman, Jr., both of St. Paul, Minn., for plaintiff.

Victor E. Anderson, U. S. Atty., and John W. Graff, Asst. U. S. Atty., both of St. Paul, Minn., and Spencer L. Baird, Dist. Counsel for Bureau of Reclamation, of Amarillo, Tex., for defendant.

BELL, District Judge.

### The Case.

The Northern Pacific Railway Company commenced this suit against the United States under the act of Congress of March 3, 1887, 28 U.S.C.A. § 41(20), commonly known as the Tucker Act, to recover a balance claimed due for freight charges on shipments of cement from six points

in the state of Washington to Odair, Washington. This action is brought by the Northern Pacific Railway Company as a delivering carrier. The Great Northern Railway Company and the Chicago, Milwaukee, St. Paul & Pacific Railway Company as connecting carriers are interested parties, although not joined as plaintiffs. If recovery is had, these carriers will share therein in accordance with the division agreements between them.

If this suit involved only the claims for unpaid balances on six freight shipments, the problem under the circumstances would be quite sufficient, but it is to establish a precedent for claims of the plaintiff aggregating approximately $2,000,000. Moreover, the defendant entered eight counter claims against the plaintiff for approximately $5,500,000. The answer is sixty-six pages in length; the transcript of the testimony covers nearly ten thousand pages; there are 5,750 exhibits; the defendant filed a brief of two thousand pages and requests for findings of fact that cover two hundred pages. Oral arguments were made April 28 to May 1 inclusive, 1946. The last brief was filed August 25, 1946. The defendant's request for findings was filed and the case finally submitted to the court August 28, 1946.

### The Pleadings.

The complaint is in six counts each based on a bill of lading for a shipment from each of the six points to Odair. The plaintiff alleges that land grant rates are applicable and in each count alleges the point of origin, the weight of the shipment, the land grant rate, the freight charges, the payment made and the balance due from the defendant. The facts alleged are summarized as follows:

The defendant alleges that the land grant rates are not applicable and that the charges for shipment of cement were subject to the provisions of a special rate contract, exhibit II, providing for a rate of 17¢ per cwt. from each of said points except Irvin which was 13¢ executed by and between the plaintiff and defendant November 19, 1934, under the Interstate Commerce Act, 49 U.S.C.A. § 22, and that the defendant has paid the plaintiff in full for all freight charges legally incurred.

The plaintiff admits the execution of the said contract but contends that it expired March 21, 1938, which was prior to the shipments of cement on which the charges are claimed in each instance and that the contract rates, therefore, do not apply.

The defendant pleads defenses as follows: (1) A general denial and allegations of payment in full; (2) that the bills of lading on which the complaint is based specified the rate for the transportation charges and, with the allegations of the complaint, constitute an admission of payment in full; (3) the special rate contract and full compliance therewith by the defendant; (4) fraud on the part of the plaintiff in procuring the execution of the rate contract by the defendant; (5) to (9) inclusive, estoppel or that the plaintiff should be denied the right to assert that the special rate contract covered only a portion of the cement used in the construction of the Grand Coulee dam and power plant on the ground that the plaintiff by misrepresentation and fraud induced the defendant to execute said contract and alter its position to its injury.

The defendant alleged that it was induced to execute the rate contract by the misrepresentation and fraud of the plain-

| Point of Origin | Weight | Land Grant Rate Per Cwt. | Charges | Payment | Balance Claimed |
|---|---|---|---|---|---|
| Metaline Falls | 689,604 | 26.83 | $1850.21 | $1172.33 | $ 677.88 |
| Irvin | 364,256 | 20.81 | 720.56 | 450.13 | 270.43 |
| Seattle | 256,640 | 21.78 | 558.96 | 436.29 | 122.67 |
| Bellingham | 484,680 | 25.19 | 1220.91 | 823.95 | 396.96 |
| Concrete | 89,780 | 24.23 | 217.54 | 152.62 | 64.92 |
| Grotto | 155,368 | 24.23 | 376.46 | 264.13 | 112.33 |

Total Balance Claimed Due............... $1,645.19

tiff at the Denver Conference and in subsequent negotiations as follows:

1. *Misrepresentations*: a. The plaintiff represented to the defendant that there was no interchange gateway at Adrian, b. as there was no interchange gateway at Adrian, it would be necessary for the plaintiff to transport the cement from the West Coast points to Adrian via the long instead of the short route, c. if the government would build a branch railroad from Odair to the project site, the plaintiff would transport cement at sufficiently low rates to recompense the defendant, d. if the high dam were constructed, the plaintiff would build the branch line of railroad and make much lower rates than if only the low dam were constructed.

2. *Concealments*: a. an agreement between the plaintiff and the Great Northern Railway Company that neither would construct a branch line from Odair to the project site, b. the agreement between the plaintiff and the Great Northern Railway Company to open the Adrian gateway and transport cement from all West Coast points via the short route, c. the plaintiff's computations on land grant rates from the six Washington points which were correct and which averaged approximately 2.73¢ less per cwt. than computations by the Bureau of Reclamation which were erroneous but on which the defendant relied, d. that the land grant rates from Trident, Montana, and Portland, Oregon, were lower than from the six Washington points except Irvin, e. that the plaintiff owns 60,000 acres of land in the irrigable area.

The defendant alleged that in reliance on the misrepresentations and without the knowledge of the facts concealed by the plaintiff when it was under a duty to divulge them the defendant altered its position to its detriment as follows: a. its forbearance to build and operate a cement plant at the project site, b. its construction of the branch railroad thus eliminating all competition in transportation and giving the plaintiff a monopoly, c. abandonment of negotiations with other railroad systems and truck lines for the transportation of materials, d. agreement to rates that were not fair and reasonable to the defendant.

The defendant alleged counter claims as follows: (1) Sums paid by the defendant to the plaintiff in excess of fair and reasonable rates on shipments from the various Washington points to Odair, (2) sums paid by the defendant to the plaintiff in excess of fair and reasonable rates based on the cost of the transportation service to the plaintiff, (3) sums representing the difference in the cost of transporting the cement and materials over a long and circuitous route and the short direct route actually used, (4) sums in excess of 11¢ cwt. from Irvin and 15¢ cwt. from the other Washington points to Odair on shipments of cement, (5) cost of construction of the branch railroad from Odair to the project site in the sum of $646,400, (6) cost of maintaining and operating said railroad in the sum of $800,000, (7) overpayment to the plaintiff of freight charges on transportation of materials in the sum of $3,380,000, and (8) overpayment of freight charges on iron and steel supplies and shipment of numerous articles other than cement amounting to $417,661.54.

The defendant prays that the plaintiff's complaint be dismissed with costs; that the special rate contract be reformed, or, in the alternative, that it be rescinded and that the court fix the value of the plaintiff's transportation services on a quantum meruit basis; that the defendant have an accounting; that the defendant have judgment against the plaintiff for $5,500,000; for costs and for general relief.

The defendant moved for summary judgment on the pleadings, and the motion was overruled.

The validity and applicability of the special rate contract, exhibit II, hereafter called the rate contract, is the crux of this suit. Under the pleadings, it was deemed necessary to receive a mass of evidence not pertinent to the validity and applicability of the contract but bearing on

other issues raised by the pleadings. The purpose and background of the contract will be helpful in understanding the controversy.

## The Project.

An empire within the state of Washington has remained almost wholly undeveloped for lack of moisture. The soil is exceedingly fertile, the climate ideal for the production of foods, yet only crops indigenous to semi-arid lands have been produced and the country now is sparsely populated and the lands are of little value. Men of vision for decades have sought a remedy for this situation. They have dreamed of a verdant countryside, comfortable homes, a larger population, beautiful cities and additional wealth. Strangely enough the necessary moisture has been at hand. The mighty Columbia River and its tributaries gather the waters of rains and melting snows from a vast area of plains and mountains and carry it in tremendous volume within easy reach of the thirsty soil.

However, a dam of mammoth proportions was necessary to capture and utilize the water of this surging river, and only some power or authority in command of almost unlimited financial resources and the finest engineering skill could produce it. The state had not undertaken it, and private capital perhaps wisely had not. Only the government of the United States safely could launch such an undertaking.

In addition to the value of such dam for irrigation purposes it could be made to produce a greater volume of electric current than any structure in the world, sufficient indeed, to supply many states of the northwestern area.

The proposal to construct such dam and irrigation system for many years was known as the Columbia Basin Project, and it had the active interest of Senators, Congressmen, civic organizations, influential citizens, three railroad systems including the plaintiff, and the state of Washington. Investigations had been made by the War Department and the United States Bureau of Reclamation and reports submitted to the effect that a dam of the Columbia River at the Grand Coulee was possible and practicable.

Plans, specifications and estimates were prepared. The dam from the base of the foundation to the top as designed would be higher than the Washington Monument. It would be 4,300 feet long, 500 feet thick at the base and would require 11,000,000 cubic yards of concrete. It would rest in a solid granite canyon and stop a river 800 feet wide and 50 feet deep which flows through the state of Washington for 750 miles and falls on its way some 1300 feet. It would raise the water level of the river 370 feet and would produce a lake extending to the Canadian Border, a distance of approximately 125 miles. It would impound sufficient water to irrigate 1,200,000 acres of land and generate 2,700,000 horse power of electric current. It would be the key structure in a comprehensive plan for the development of the natural resources of the Columbia Basin and would become known as the "Eighth Wonder of the World."

The Grand Coulee location was selected because, from an engineering standpoint, the natural conditions at that place made the construction and operation of the dam most feasible and practicable, and because the Grand Coulee would create a reservoir of more than five million acre feet of useable capacity adjacent to the area to be served. An ancient bed of the Columbia River, appropriately called the Grand Coulee, was near the location for the dam. This coulee was 52 miles long, two to five miles wide and from 600 to 800 feet deep. It could be dammed at each end and a reservoir formed providing for gravity flow into the irrigation system. It was planned to use sufficient electric current generated at the dam to pump 16,000 cubic feet of water per second a vertical distance of 280 feet into the Grand Coulee Reservoir from which the flow for irrigation could be regulated.

It was estimated that the entire project would cost approximately $400,000,000. It required a dam at a cost of $208,000,000,

an irrigation system at the cost of $200,000,000, and, in addition, a high elevation reservoir and extensive power and pumping machinery and equipment. The electric power switch yard at the plant cost $8,000,000. No action had been taken to finance such project prior to June 16, 1933. On that date the National Industrial Recovery Act, 48 Stat. 195, became a law and an appropriation of $4,000,000,000, to be used by the government to relieve unemployment, was made. The prospect of a large number of people being employed by the government naturally directed minds in the state of Washington to the Columbia Basin Project. This law opened the way, not only for the employment of 5,000 to 6,000 people, but also for the government to launch a long desired public enterprise, and so the sum of $63,000,000 was allotted for the construction of the Grand Coulee dam. This sum was estimated to be a small proportion of the cost of the complete project. It was recognized that the sum allotted would finance the construction of a plant that would utilize not more than 30% of the potential power of the river and that it would not provide for any irrigation. For various reasons it was believed necessary to keep the initial investment within the limits of the allotment made. Influences in other sections of the country and private power interests particularly were opposed to the project.

Plans were prepared for a dam that could be built within the sum allotted. This plan would raise the water level 150 feet, produce 700,000 horse power of electric current but would not provide irrigation. It was in connection with this structure that specifications 570 were prepared. Thus plans were developed for two dams, one of large proportions and the other much smaller in comparison. The greater structure became known as the "high" dam and the lesser the "low" dam. In the trial of this case much has been said about the high dam and the low dam. In the rate contract executed by the plaintiff and the defendant, the term "Grand Coulee dam and power plant" was used to designate the dam. The plaintiff contends that the term was used in the contract to describe the low dam while the

defendant contends that it referred to the entire structure as completed. If the former, the contract was for the transportation of 1,600,000,000 pounds of cement; if for the latter, it was for 4,360,000,000 pounds. In other words the plaintiff claims that it contracted to carry the lesser quantity while the defendant claims that it contracted for the larger quantity. The difference is approximately two million dollars.

All interested persons wanted the high dam and no one wanted the low dam. The government engineers strongly advocated the construction of the high dam. However, it was decided to build the low dam and thus cut the garment according to the cloth. Whether the high dam would be constructed apparently depended at the time on whether the necessary funds would be forthcoming in the future.

The plaintiff had a very material interest in the construction of the high dam. It required three times as much material for the high dam as for the low dam. The difference in revenue was substantial. Moreover, the plaintiff owned about 60,000 acres of land in the irrigable area acquired largely through Congressional land grant. Of much greater importance was the fact that the plaintiff serves nearly 50% of the irrigable area and its development would produce revenues estimated at from $13,000,000 to $18,000,000 annually. The revenues to the plaintiff from transporting materials for the dam were of minor importance in comparison to the future benefits, if a dam providing irrigation were constructed.

### Transportation.

Transportation of materials at the outset was recognized as a serious problem. The project site was thirty miles from Odair on the plaintiff's railroad, about the same distance from Mansfield on the Great Northern, and sixty-five miles from Neppel on the Milwaukee. Transportation other than by rail seemed impracticable. After extensive investigations and study, the government engineers obviously reached the conclusion that a branch railroad from Odair to the site of the project would be

the most practicable solution of the problem. The terrain from Odair to the site presented less engineering difficulties than from Mansfield or any other point.

The map of the state of Washington will be helpful. The Grand Coulee dam is slightly north of west and about 94 miles from the city of Spokane. The area is

served by the lines of three railroad systems; the plaintiff, the Great Northern, and the Milwaukee. Bellingham, Concrete, Grotto, and Seattle are locations of the so-called West Coast mills. Two routes from the West Coast mills readily are discernible, the long route via the plaintiff's lines through Yakima, Pasco, Connell and West Warden, and the short route via the Great Northern through Grotto to Adrian thence via the Northern Pacific to Odair. These points are an average distance from Odair of 235 miles via the short route and 440 miles via the long route. Irvin near Spokane is 130 miles and Metaline Falls in the northeast corner of the state is 249 miles from Odair. From Metaline Falls shipments were made by the Milwaukee to Spokane or Rathdrum thence via the Northern Pacific to Odair. From Irvin shipments were made via the Northern Pacific Railway Company to Odair. The plaintiff's line makes contact with the Great Northern at Adrian which is 21.2 miles from Odair. The latter is about 30 miles from the dam. The following table shows the difference in these routes:

false at the time they were made by the plaintiff; and that, in any event a secret agreement was made by the plaintiff with the Great Northern Railway October 1, 1934, to open the Adrian gateway, which was nine and one-half months before the rate contract was signed by the Secretary and that it was the duty of the plaintiff to inform the defendant of such contract. With the exception of approximately sixteen thousand barrels used for bridge pier construction at the beginning of operations, all shipments of cement from the West Coast mills were made via the short route.

The plaintiff made application to the Interstate Commerce Commission November 3, 1933, for a certificate of public convenience and necessity authorizing the construction and operation of a line from Odair to the project site. The certificate was granted February 13, 1934, but in March of 1934 the plaintiff declined to construct such line. About this time a representative of the plaintiff importuned the commissioner of the Bureau of Reclamation at Washington to recommend to the engineers of the Bureau at Denver that

| Point of Origin | Rail Miles to Odair | | Per Cent of Circuity |
|---|---|---|---|
| | Long Route | Short Route | |
| Bellingham | 475 | 269 | 77 |
| Concrete | 469 | 273 | 72 |
| Grotto | 448 | 158 | 184 |
| Seattle | 367 | 240 | 53 |
| Metaline Falls | 315 | 246 | 28 |
| Irvin | 199 | 130 | 53 |

The difference in these routes is important because the defendant contends that the agents of the plaintiff represented to the engineers of the government that the short route could not be used because there was not an interchange gateway at Adrian where the lines of the plaintiff contacted those of the Great Northern and that it was necessary to transport the cement from the West Coast mills via its lines an average distance of four hundred forty miles, that is, over the long route and that the rate necessarily had to be based on the cost of the service for that distance. The defendant contends that these representations were

the government construct such line, on the theory that the plaintiff would reduce freight rates on materials for the dam sufficiently to recompense the government for its cost. This situation led to the Denver Conference.

### Denver Conference

Representatives of the plaintiff and defendant from March 28 to April 4, 1934, met at Denver, Colorado, to consider the transportation problems particularly the construction of a branch railroad from Odair to the project site and freight rates for the transportation of materials required

for the project. This meeting has become known as the Denver Conference. It was attended by H. E. Stevens, Vice President, R. W. Clark, General Traffic Manager, now Vice President in Charge of Traffic, F. A. Cleveland, General Freight Agent, J. L. Burnham, Western Traffic Manager, and J. W. Haw, Director Agricultural Development Department, as representatives of the plaintiff. The government was represented by R. F. Walter, Chief Engineer, S. O. Harper, Assistant Chief Engineer, and Frank A. Banks, Construction Engineer, and a traffic clerk, Bureau of Reclamation. The rate contract which is of vital importance in this suit was the outgrowth of the Denver Conference.

The representatives of the plaintiff in the Denver Conference had devoted their active lives to the railroad business and not only were rate experts but also were entirely familiar with all phases of railroading. The objectives of the conference were railroad building and rate making, subjects with which they were well qualified to deal. In this conference they knew their own ground thoroughly and they knew precisely the situation of the government. They knew that it had $63,000,000 to spend on the Grand Coulee dam and power plant with a possibility of a much larger sum in the future, and that it desired to proceed as expeditiously as possible; that the project if completed would require the transportation of 6,000,000,000 pounds of material to a point then thirty miles from a railroad. They knew the necessity of an extension of a branch railroad either from the lines of the plaintiff, the Milwaukee or the Great Northern. They knew that a railroad from Odair to the project site would give the plaintiff a position of primacy that would enable it to dominate traffic and to make advantageous agreements with connecting lines for a division of revenues. They wanted the railroad and yet they had no intention of building it if they could induce the government to do so. Of course, they were fully aware of the fact that the plaintiff was under no legal duty to the defendant to construct such road. Therefore, the plaintiff had two principal objectives at the conference: (a) To induce the government to build a railroad from its station

Odair to the project site and (b) to obtain a contract to transport the material for the project at the most satisfactory rates obtainable.

The representatives of the defendant in the Denver Conference were civil engineers of unquestioned skill, but they were not experienced in railroading or in rate making, the subjects of the conference, consequently, they were at a disadvantage. They desired immediate action to relieve unemployment and to commence the construction of a public enterprise of huge proportions. Because of the nature of the work, they were forced to show their hand. They were in no position to delay or to drive a bargain.

One difficulty of transcendent importance confronted both sides at the Denver Conference which was whether funds would be forthcoming to construct the high dam. At that time a sufficient sum had not been appropriated or allotted for that purpose. Every officer of the United States from the President down, who had anything to do with the project, favored it. In the conference the representatives of the plaintiff stated that if it could be assured that the high dam would be constructed, the plaintiff would build the branch railroad and agree to lower rates than if merely the low dam were constructed. The representatives of the United States, of course, could not give such assurance. Only Congress could do that.

The Denver Conference was opened with H. E. Stevens, Vice President, representing the plaintiff. The object of his presence was to inform the representatives of the government that the plaintiff would not build the branch road and if possible to induce them to use government funds for that purpose. He was not there to negotiate rates or to consider rates except to present the argument that, if the plaintiff were not required to construct the road, rates could be reduced on materials for the dam so as to recompense the government for the cost of the road. As a matter of fact, the plaintiff and the Great Northern had agreed that neither would construct such road. When Stevens and the government engineers had reached a tentative agreement for the construction of the road by the

government, Stevens terminated his negotiations. The result of his conference is outlined in his letter to the chief engineer for the Bureau dated March 28, 1934. The question of the construction of the branch road had been decided. The first objective of the conference had been attained by the plaintiff. In his letter he stated that responsible traffic officers of the company would confer with the representatives of the government and undertake to determine maximum rates that would be equitable and take into consideration all factors of the transportation problems. Clark, Burnham, and Cleveland, traffic officers, promptly appeared and negotiations for rates were opened.

At this conference each party was armed with an array of data pertaining to the subject under consideration. The negotiators had before them the plans, specifications and estimates of the low dam and the high dam, the maps showing the short and long routes from the cement mills to the site of the project and the tariff rates from possible points of origin to Odair. The plaintiff had calculated the cost of the service over the different routes and the possible revenue from low dam and from high dam quantities. The representatives of both the plaintiff and the defendant had calculated the land grant rates. The calculations of the plaintiff were correct, but those of the defendant were incorrect and were substantially higher than the actual land grant rates. Therefore, the plaintiff knew the land grant rates and the defendant did not but believed they were higher than they actually were. The calculations of the plaintiff were not revealed but those of the defendant were placed before the conference. The representatives of the plaintiff not only knew the land grant rates, but they also knew that the representatives of the defendant did not know them, and they knew that the representatives of the defendant believed the land grant rates were substantially higher than they actually were. The commercial rates and the land grant rates as calculated by the plaintiff and the defendant follow:

| Point of Origin to Odair | Commercial Rate | Calculations of Land Grant Rates | |
|---|---|---|---|
| | | Plaintiff | Defendant |
| Bellingham | 30.5¢ | 22.012¢ | 22.77 |
| Concrete | 30.5¢ | 21.836¢ | 22.79 |
| Grotto | 30.5¢ | 21.836¢ | 22.79 |
| Seattle | 30.5¢ | 18.058¢ | 20.87 |
| Metaline Falls | 27¢ | 24.2¢ | 25.93 |
| Irvin | 20.5¢ | 18.6¢ | 19.27 |

The question of whether the low dam or the high dam would be constructed was considered because of its bearing on the quantity of materials to be transported. The route was important because of its bearing on the cost of the service which presumably was the basis for fixing the rates. The question of the interchange gateway at Adrian was involved because it was determinative of the route from the West Coast mills to Odair. This gateway at the time was closed but could be opened by agreement between the plaintiff and the Great Northern Railway Company. That an agreement for the interchange of shipments under a Section 22 contract with the United States could be effected must have been certain to the representatives of the plaintiff in the conference.

A tentative agreement was reached April 4, 1934. Negotiations were continued and the written contract placed in its final form some eight months later. It was outlined in the Clark letter of April 4, 1934, to the Chief Engineer. The contract was dated November 19, 1934. It was signed by the plaintiff March 4, 1935, and by the Secretary of the Interior July 17, 1935, fifteen and one-half months after the Denver Conference.[1]

---

[1] The Contract: Exhibit II
"United States I1r–804
 "Department of the Interior
 "Bureau of Reclamation
"Grand Coulee Dam and Power Plant
"Columbia Basin Project, Washington
"Contract between United States of America and Northern Pacific Railway Company for construction of standard-gauge construction railroad from Odair, Washington, to Grand Coulee dam site.

"1. This contract, made this 19th day of November 1934, in pursuance of the act of Congress of June 16, 1933 (48 Stat. 196), known as the National Industrial Recovery Act, between The United States of America (herein styled the United States), acting in this behalf by Harold L. Ickes, Secretary of the Interior (herein styled the Secretary), and the Northern Pacific Railway Company, a corporation of the State of Wisconsin

A number of well settled principles of the law of contracts will be helpful:

■ The meaning of a contract should be ascertained from the language of the written instrument itself and where the provisions are plain and unambiguous the contract is conclusive. Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265; De Witt v. Berry, 134 U.S. 306, loc. cit. 312, 10 S.Ct. 536, 33 L.Ed. 896; Fogle & Co. v. United States, 4 Cir., 135 F.2d 117; International Co. of St. Louis v. Sloan, 10 Cir., 114 F.2d 326; Pitcairn v. American Refrigerator Transit Co., 8 Cir., 101

(herein styled the Company), having its principal place of business at St. Paul, Minnesota. Witnesseth:

"2. Whereas, the United States is engaged under the National Industrial Recovery Act in constructing the Grand Coulee dam and power plant of the Columbia Basin project, in the State of Washington, and, as a part of such work, proposes to construct a standard-gauge construction railroad from Odair, Washington, a siding on the Northern Pacific Railroad, about two miles northeast of Coulee City, Washington, to the Grand Coulee Dam site, on the Columbia River, about thirty miles northeast of Coulee City, Washington, consisting of yard tracks at Odair for the purpose of interchanging and storing cars, a single-track railroad from Odair to the head of Grand Coulee, a siding at the head of Grand Coulee, a single-track railroad from the head of Grand Coulee to the Grand Coulee Dam site, and a siding near the dam site; and

"3. Whereas, it is contemplated that the contractor for construction of the Grand Coulee dam and power plant (herein styled the Contractor) will operate and maintain the construction railroad after its completion; and

"4. Whereas, the Company, has heretofore made surveys for such a railroad, and is willing to turn over to the United States all data covering such surveys and suggestions for the construction of such railroad without charges; and

"5. Whereas, the Company is willing to furnish to the United States, free of charge, f. o. b. cars at Odair, Washington, sufficient rail and fastenings to complete the construction of such railroad, including yard, tracks and sidings, from a connection with the Washington Central Branch of the Company at Odair, Washington, to the Grand Coulee Dam site; and

"6. Whereas, the Company is willing to establish maximum net cash freight rates on certain materials, supplies and equipment moving on Government bills-of-lading and used in the construction of the Grand Coulee dam and power plant,

"7. Now, therefore, in consideration of the premises and of the covenants and conditions herein contained, it is agreed between the parties as follows:

"8. The United States will construct a standard-gauge railroad to extend from Odair, Washington, on the Washington Central Branch of the Company, about two miles northeast of Coulee City, Washington, to the Grand Coulee Dam site, on the Columbia River, about thirty miles northeast of Coulee City, Washington, as shown on the location map hereto attached, marked Exhibit A, made a part hereof, such railroad to consist of yard tracks for the purpose of interchanging and storing cars at Odair, a single-track railroad from Odair to the head of Grand Coulee, a siding at the head of Grand Coulee, a single-track railroad from the head of Grand Coulee to the Grand Coulee Dam site, and a siding near the dam site.

"9. The United States will furnish the right-of-way for the railroad and will perform the necessary work of construction, and will furnish, at its own expense, all supplies and materials going into the railroad, except second-hand rail, angle bars, switch material and tie plates for use on sharp curves.

"10. The Company will turn over to the United States, without charge, complete data covering the preliminary surveys for the railroad as heretofore made by the Company, and will stake out on the ground the definite center-line location of the railroad, and will also make available to the United States the Company's plans, specifications, and estimates for construction of the railroad.

"11. The Company will also furnish to the United States, without charge, f. o. b. cars at Odair, Washington, sufficient suitable secondhand 90-lb. rail, angle bars, frogs, switches, and tie plates for sharp curves, to complete the construction of the railroad as specified in Article 8. It is understood that the demurrage agreement hereinafter provided for will apply to the cars of track material after acceptance by the United States.

"12. The following maximum rates, in cents per hundredweight, are hereby established by the Company on cement moving over existing rail routes in cars loaded to maximum capacity from certain points, as herein listed, in the State of Washington to Odair, Washington, on Government bills-of-lading, for use in

F.2d 929; Wm. Lindeke Land Co. v. Kalman, 190 Minn. 601, 252 N.W. 650, 93 A.L.R. 1393.

▆ In the construction of contracts, language should be given if possible its usual and ordinary meaning and the object is to find out from the words used what the parties intended. Florida Central Railroad v. Schutte, 103 U.S. 118, 26 L.Ed. 327; Ætna Insurance Co. v. Boon, 95 U.S. 117, 24 L.Ed. 395; United States v. Montgomery Ward & Co., 7 Cir., 150 F.2d 369; Shell Oil Co. v. Manley Oil Corporation, 7 Cir., 124 F.2d 714.

▆ A court will not resort to rules of construction where the intent of the parties

---

construction of the Grand Coulee dam and power plant:

| | |
|---|---|
| Irvin | 13¢ |
| Metaline Falls | 17¢ |
| Bellingham | 17¢ |
| Concrete | 17¢ |
| Seattle | 17¢ |
| Grotto | 17¢ |

On the balance of the items of materials, supplies and equipment to be used in the construction of the Grand Coulee dam and power plant and moving on Government bills-of-lading, the established commercial freight rates over existing routes, less land-grant deduction, shall apply, with the following exceptions:

"(1) From Seattle and Tacoma, Washington, the established commercial freight rates applicable from Portland, Oregon, over existing routes, less land-grant deduction, on iron and steel articles and machinery shall apply;

"(2) The following maximum rates shall apply on lumber and cribbing

| | |
|---|---|
| From Sand Point, Idaho, | 18¢ |
| From Coeur d'Alene, Idaho, | 14¢ |
| From Spokane, Washington, | 12½¢ |

The rates hereinabove shall not be increased or decreased during the term of this contract unless in the opinion of the United States and the Company such rates become inequitable because of changed conditions. If the necessity arises for revising said rates or for the fixing of rates on additional items or from additional points, adjustments will be made in the established rates or such new rates will be made as may be agreed to by the authorized representatives of the Company and the United States.

"13. Operation and maintenance of the railroad will be under the direct supervision and control of the United States. The United States having heretofore, under date of July 16, 1934, entered into a contract

"(Symbol No.12r–4359) with Silas Mason Company, Inc., a New York corporation, the Walsh Construction Company, an Iowa corporation, and the Atkinson-Kier Company, a partnership consisting of Guy F. Atkinson, George H. Atkinson, William E. Kier and Elmer L. Kier of San Francisco, California (for convenience now styled collectively the

Contractor), wherein it is provided in paragraph 51 of Specifications No. 570, made a part of the said contract, that the Contractor will operate and maintain the railroad after its completion, the Contractor will be required to provide reasonable service thereunder for handling the business of the United States and others during the period of the said contract.

"14. The United States agrees to interchange loaded and empty cars with the Company at Odair and to handle same in the manner usual between common-carrier railroads. The Company will deliver cars upon such tracks in said yard as may be mutually agreed upon between the United States and the superintendent of the Company. The United States will deliver cars to the Company upon tracks designated for that purpose in said yard. The United States agrees not to operate engines or cars nearer to the tracks of the Company than a point to be marked on the ground by the Company designating where engines or cars of the United States shall stop.

"15. All cars and equipment placed by the Company on the designated tracks in said interchange yard shall be deemed to be in the possession of the United States and to continue in the possession of the United States from the time so placed upon said designated tracks by the Company until the Company shall move said cars from said yard onto its own tracks. The United States shall pay the Company demurrage accruing on all cars and equipment owned by the Company and on cars and equipment owned by others for which the Company is responsible while such cars and equipment are in the possession of the United States, but such demurrage charge shall not be made after the United States has notified the Company that such cars and equipment are available for the use of the Company at Odair and may be removed from such interchange yard. All settlements for such demurrage shall be made in accordance with the terms and provisions of the American Railway Association Freight Tariff 4–N, I.C.C.No. 2639, B. T. Jones, Agent, naming national car demurrage rules and charges, sup-

is expressed in clear and unambiguous language. New York Life Insurance Co. v. Jackson, 7 Cir., 98 F.2d 950; Columbia Gas Construction Co. v. Holbrook, 81 F.2d 417; MacDonald v. Commissioner of Internal Revenue, 6 Cir., 76 F. 513, 17 C.J.S., Contracts, § 294. p. 683.

■ A contract is ambiguous when it is reasonably and fairly susceptible to two different constructions. Order of United Commercial Travelers v. Sevier, 8 Cir., 121 F.2d 650; Blevins v. Reidling, 289 Ky. 335, 158 S.W.2d 646.

■ A contract is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which the language used depends for its meaning. National Pigments & Chemical Company v. C. K. Williams Company, 8 Cir., 94 F.2d 792.

In view of these principals the language of the rate contract claims attention. The plements thereto and reissues thereof including the average basis for settling for detention to cars.

"16. The United States shall be responsible for loss of or damage to cars and equipment of the Company and cars and equipment owned by others for which the Company is responsible, while such cars and equipment are in the possession of the United States, ordinary wear and tear excepted.

"17. In the event the United States shall operate the railroad, then it is agreed that, except in cases were liability results solely from negligence of the Company, the Company does not and shall not assume any liability for injury to or death of any person or persons or loss of or damage to any property, when such injury, death, loss or damage is caused by, results from, or arises during and in consequence of the operations by the United States.

"18. The Contractor for operation of the railroad, as referred to in Article 13, shall furnish the Company with an indemnity agreement protecting the Company against any and all claims arising or growing out of alleged defects in cars and equipment owned by the Company and cars and equipment owned by others for which the Company is responsible.

"19. The Company shall provide such employees and facilities as may be necessary for maintaining and operating interchange facilities at Odair, and the costs thereof, other than maintenance of trackage, will be equally divided between the Company and the United States. The Company shall render quarterly to the United States itemized bills covering such costs, plus fifteen per cent to cover superintendence and expenses not possible of exact ascertainment.

"20. The United States shall return to the Company, without cost, f. o. b. cars at Odair, Washington, all rail and fastenings furnished to the United States by the Company in as good condition as when furnished by the Company, ordinary wear and tear excepted, promptly on completion of the Grand Coulee dam and power plant; *provided* that if, on completion of the dam and power plant, it appears probable that the United States will, within a few years thereafter, proceed with the work of increasing the height of said dam, the Company will not require return of the rail and fastenings until the said high dam has been completed; and *provided* further that, if no decision as to the construction of the proposed high dam is reached within a period of ten years from the date of this agreement, the United States will, on demand of the Company, pick up and return the rail and fastenings to the Company, free of charge, f. o. b. cars at Odair, Washington; and *provided* further that, at the option of the United States, the Company will pick up the rail and fastenings and the United States shall pay to the Company the actual cost of doing such work.

"21. No member of or delegate to Congress, or resident commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

"22. The performance by the United States of any obligation undertaken hereunder involving the expenditure of money is dependent upon the availability of appropriated funds and/or allocated public works funds for the purpose, and in all cases where such funds are not available the United States is hereby released of all claims on account of such nonperformance due to such nonavailability.

"In Witness Whereof, the parties hereto have signed their names the day and year first above written.

"The United States of America,
"By /s/ Harold L. Ickes,
"Secretary of the Interior.
"Northern Pacific Railway Company,
"By /s/ Charles Donnelly, Pres.
"(Seal) Attest:
"A. M. Gottschald, Asst. Secy."

agreement of the parties to this action should be determined from the contents of this document unless it is indefinite, uncertain or ambiguous. An analysis of the language pertaining to the issues in this case should be made.

The contract up to paragraph 12, except formal recitals, is devoted to the construction of the railroad from Odair to the project site. It was agreed that the defendant would furnish the right of way and construct, maintain, and operate the railroad; that the plaintiff would furnish to the defendant its preliminary surveys, plans, specifications and estimates for the construction of the railroad, and also furnish sufficient second-hand rails, angle bars, switches, and tie plates for sharp curves which were to be returned to the plaintiff; and that the contractor engaged to construct the dam would be required by the defendant to operate the railroad.

Section 13 of the contract placed the operation and maintenance of the branch railroad under the direct supervision and control of the United States and recited the fact that on July 16, 1934, the United States had made a contract with the Silas Mason Company and associates wherein it was "provided in Paragraph 51 of specifications No. 570, made a part of the contract," that the contractor would operate and maintain the railroad after its completion.

We are primarily concerned with Section 12 containing the rate fixing provisions of the contract. The points of origin and destination are designated. The contract covered cement shipped from the six designated Washington points only. It did not cover cement shipped from other places. The shipments had to be on "government bills of lading." The rates specified are designated as "maximum." The rates applied to cement for use in the construction of the "Grand Coulee dam and power plant." The paramount question for solution is what is meant in the contract by the "Grand Coulee dam and power plant." Does it mean the high dam or the low dam; or, in other words, does this provision of the contract cover the transportation of the cement for the dam as authorized by specifications No. 570 plus Change Order No. 1, or for the entire structure as completed? If there is anything in the contract that is indefinite, uncertain or in need of elucidation, it is the meaning of the language used to describe the dam. The meaning of perfectly correct language may be dependent on the circumstances under which it is used. A word may have no fixed legal significance as "premises" in O'Connor v. Great Lakes Pipe Line Co., 8 Cir., 63 F.2d 523. Unlike that word "Grand Coulee dam and power plant" has a very definite meaning; and yet, in view of the diverse contentions, an examination of the adoption of that description will be made.

It is contended by the government that "Grand Coulee dam and power plant" under the circumstances meant about what the United States desired to make it. In Paragraph 24 [2] of the specifications the government reserved the right to change the location, plans, alignment, dimensions or design of the dam; and in Paragraph 25 [3] it

---

[2] Section 24:

"When additional information regarding foundation or other conditions becomes available as a result of the excavation work, further testing, or otherwise, it may be found desirable to change the location, alignment, dimensions, or design of the dam or power plant to meet such conditions. The Government reserves the right to make such reasonable changes as, in the opinion of the contracting officer, may be considered necessary or desirable, and the contractor shall be entitled to no extra compensation because of such changes, except that any increase in the amount of excavation, concrete, or other required work, for which items are provided in the schedule, will be paid for at the unit prices bid therefor in the schedule. The contractor's plant shall be laid out and his operations shall be so conducted as to accommodate any reasonable change in the location and design of the dam and power plant, or any part thereof, without additional cost to the Government."

[3] Section 25:

"If at any time within the contract period, the construction of the Grand Coulee dam to the full height contemplated for the ultimate development of the project, is authorized, the Government shall have the right to terminate the contract under these specifications upon

reserved the right, by order for a change, to discontinue the work under the contract and specifications on thirty days' notice and to proceed with the construction of a different dam with the same or another contractor. The plaintiff was fully aware of these provisions.

The contract of the government and the Mason Company dated July 16, 1934, expressly made Specifications 570 a part thereof. The specifications gave the location and description of the dam, the date for beginning and completion of the work and comprehensive data describing in detail the project.

The only language in the contract about which there can be any controversy is the meaning of "Grand Coulee Dam and power plant." There are two letters on which the plaintiff strongly relies to sustain its position that the contract covers material for the low dam only. The letter of H. E. Stevens,[4] Vice President of the plaintiff in charge of traffic, dated March 28, 1934, and

thirty (30) days' notice in writing to the contractor, and, in such event, the contractor shall turn over to the Government, free of encumbrance, all plant, tools, and equipment of the contractor, including camp and appurtenances, which are installed at the time of such termination or contracted for in writing, in use or to be used exclusively in the work under these specifications, and, at the option of the contractor, shall include consumable supplies of the contractor, on hand or in transit on the date of the notice of termination, including explosives, fuel, lubricants, and materials of construction not incorporated in the work, but shall not include commitments for the purchase of consumable supplies or construction materials extending beyond the date of the notice of termination."

4 Stevens Letter:

"Denver, Colorado, March 28, 1934
"Mr. R. F. Walter, Chief Engineer,
"Bureau of Reclamation,
"Denver, Colorado
"Dear Sir:

"Confirming our verbal understanding this morning, the Northern Pacific Railway Company agrees to furnish f. o. b. Coulee City, sufficient rail and fastenings to complete the construction of a railway, including yard, tracks and sidings, from a connection with the Washington Central Branch near Coulee City to the head of the Grand Coulee Canon. We will also turn over to you the complete data covering our preliminary survey for this railway and agree to stake out on the ground definite location of center line, also furnish subject to your approval, specification for its construction. No charge to be made by the railway company for the use of the rails or for the survey data and engineering work.

"The Government agrees to include in its specifications and proposal blanks, covering the construction of the Grand Coulee Low Dam project, items to cover grading, ballasting, track laying and surfacing of the above described railway on a right-of-way to be furnished by the Government. It will also require the successful bidder to proceed with the construction of this railway with all possible dispatch promptly on the award of the general contract.

"The Government further agrees that it will return to the railway company without cost to it, f. o. b. cars Coulee City, all rail and fastenings loaned to it by the railway company promptly on completion of the Low Dam Project. Provided, however; that, if on completion of this project, it appears probable that the Government will, within a few years thereafter, proceed with the construction of the High Dam Project, the railway will not require the return of the rails and fastenings until the High Dam Project has been completed. If no definite decision on construction of the High Dam is reached within a period of ten (10) years from date, the Government will, on demand of the railway company, pick up and return the rail and fastenings to the railway free of charge, f. o. b. Coulee City; at the option of the Government the railway will pick up the rail and fastenings, the Government to pay the railway the actual cost of doing the work.

"The Government agrees to require its general contractor to maintain the railway and to provide reasonable service thereover for handling the business of the Government and others throughout the contract period. Revenues for handling other than Government business over the railway to accrue to the Government but to be entirely independent of rates fixed by the railway company for delivery of materials at the interchange point of connection with its Washington Central branch.

"It is my understanding that the above conditions are acceptable to you provided we can agree on maximum rates for major items of material shipped on Government bills of lading. A responsible

the letter of R. W. Clark,[5] General Traffic Manager, who has succeeded Stevens, dated April 4, 1934, both directed to R. F. Walter, Chief Engineer, Bureau of Reclamation.

In the Stevens letter reference is made to the "low dam project" and the "high dam project" and in the Clark letter reference is made to the "low dam unit at Grand Coulee." Obviously the authors of these letters at the time they were written had in mind the low dam and made reference to it by appropriate descriptions. These letters were written at the time of the Denver Conference when funds were available for

traffic officer of our company will confer with you not later than April 3rd, 1934 and undertake to determine these maximums on a basis that will be equitable and take into consideration all factors of your transportation problem.

"I am enclosing herewith estimated quantities of principal items entering into the construction of the proposed railway as determined from our preliminary survey.

"Yours truly,
"H. E. Stevens
"Vice President
"HES/JC Northern Pacific Railway"

5 Clark Letter:
"Northern Pacific Railway Company
"Traffic Department
"R. W. Clark, St. Paul, Minn.
"General Traffic Manager
"At Denver, Colorado
"April 4, 1934
"Dear Sir:

"Under the plan that the Government will finance the construction of a railroad from Odair to the Grand Coulee dam site on the basis outlined in Mr. Stevens' letter to you of March 28, 1934, the Northern Pacific Railway Company will quote to point of connection with this proposed line net cash rates, in cents per hundred weight, as shown herein, as maximum rates on material moved on Government bills of lading and used in the construction of the so-called low dam unit at Grand Coulee.

"The tonnages on material used in this computation are those shown on statement you furnished, headed 'Estimated Freight Costs on Material for Low Dam Grand Coulee—Columbia Basin.' The total tonnage of materials as shown on that statement is 1,800,000,000 pounds, or 900,000 tons; and of this total, 1,600,000,000 pounds, or 800,000 tons, is cement.

"It is our understanding that it will be the policy of the Government, so far as possible, to use in the construction of this unit materials originating in the State of Washington.

"You furnished us information that the six cement plants shown on your statement have a daily capacity in barrels as follows:

| | |
|---|---|
| Irvin ............ | 1,800 |
| Metaline Falls ........ | 1,650 |
| Bellingham ........... | 2,700 |
| Concrete ............. | 3,500 |
| Seattle ............. | 3,300 |
| Grotto ............. | 1,650 |
| Total | 14,600 |

"You indicated that it would be your policy to divide the order on a prorate basis on the capacity of the plant, question of quality being satisfactory.

"The Railway Company proposes as maximum net cash rates on cement as follows:

| | |
|---|---|
| Irvin ............. | 13¢ |
| Metaline Falls ........ | 17¢ |
| Bellingham ......... | 17¢ |
| Concrete .......... | 17¢ |
| Seattle .......... | 17¢ |
| Grotto .......... | 17¢ |

"We will apply on the balance of the items listed in the first three classes of your statement the commercial rates less land grant deduction, with following exceptions:

"(1) We will quote from Seattle and Tacoma the net cash rate applicable from Portland on iron and steel articles and machinery; and

"(2) We will quote on lumber and cribbing as maximum rates;

| | |
|---|---|
| From Sand Point | 18¢ |
| " Coeur d'Alene | 14¢ |
| " Spokane | 12½¢ |

"I understand from our discussions that, if the cement is bought from present existing plants, the rates quoted in this letter will insure movement of this cement via existing rail routes.

"I appreciate the opportunity you have given to discuss these matters, and we will be glad to work out with you from time to time such adjustments as may be necessary to meet any fair competition that may develop as the work proceeds.

"Very truly yours,
"SGD R. W. Clark
"Mr. R. F. Walter,
"Chief Engineer, Bureau of Reclamation
"Denver, Colorado

"I am agreeable to the above arrangement.
"SGD R. F. Walter
"Denver, Colo. Chief Engineer"

construction of the low dam only, the dam under consideration, and the descriptions used in referring to the project were entirely appropriate. These letters were written more than one year and four months before the contract finally was executed. It had been drafted and redrafted many times. Numerous letters pertaining to it had been written and many conferences held. These letters were used as a basis for drafting the contract, but for some reason these terms were not acceptable to the government. The description "Grand Coulee dam and power plant" was used instead. It is reasonable to conclude that this was done in the Bureau of Reclamation so that any change could be made in the dam, as provided in the construction contract, without disturbing the provisions of the rate contract.

About the time of and shortly after the Denver Conference a number of important steps in rapid succession were taken in 1934 that showed conclusively that a dam would be constructed without delay. On bids opened March 19, 1934, the government purchased 16,000 barrels of cement, shipments of which were commenced May 10, 1934, via plaintiff's lines. Plans and specifications 570 for the construction of the low dam were completed April 16, 1934, and invitation for bids to build the railroad from Odair to the project site was issued April 20. An invitation to build the dam in accordance with specifications 570 was issued April 21, 1934. Bids for the construction of the railroad were opened May 17, and the contract therefor was executed July 17, and it was substantially completed by December 8. Bids for the construction of the dam were opened June 18, and the contract therefor was executed July 16. A labor force was assembled; housing facilities provided; a bridge across the Columbia River was constructed; highways were improved; and necessary materials and machinery assembled. The President and the Secretary of the Interior inspected the project site August 3 and publicly announced that the high dam would be constructed. By the time the contract was signed in July, 1935, the plan to construct a low dam had been abandoned and it was definitely settled that the high dam would be constructed, so the description of the dam in the contract was changed accordingly.

The question here is what was in the mind of the parties at the time the contract was executed and not at the time of the Denver Conference or when the letters were written. As the situation developed, the officers of the Bureau obviously desired a contract covering such dam as might be constructed and the officers of the plaintiff just as obviously concluded to accept the change in description. As time advanced and it became certain that the high dam would be constructed, the intention of these participants advanced with the progress of developments to the thought that this contract should cover the materials for such dam as the government might construct. The evolution of the minds of the parties is indicated by a comparison of the language of the Stevens and Clark letters with that of the contract. When the contract was executed by the plaintiff in March and the defendant in July, 1935, with full knowledge that the high dam then was being constructed, manifestly both parties accepted Grand Coulee dam and power plant to mean the high dam. In Cowles Electric Smelting & Aluminum Co. v. Lowrey, 6 Cir., 79 F. 331, 344, the court said:

"It is a well-established doctrine that a party must be deemed to have assented to the contract in such a sense as he knew the other party intended it to signify, provided the language employed is capable of such a meaning. And we have no doubt that for the purpose of construing this contract we must suppose that the parties intended to deal with existing things, and in the form and character in which they existed."

If nothing other than the Stevens and Clark letters appeared in the record, the consent to the change possibly might be regarded as an oversight on the part of the officials of the plaintiff, but it was not an oversight; to the contrary it was a subject of discussion by them and for the consideration of the plaintiff's legal department. Plaintiff's General Manager on June 11, 1934, in a letter to the plaintiff's Vice President said: "Paragraph 12 provides for maximum freight rates and for reduction by agreement, and the contract is indefinite

in term, the inference being from Paragraph 15 (Paragraph 20 of the contract as executed) that it shall be in effect for at least ten years, though apparently it might remain in effect indefinitely, even were the railroad removed at the end of ten years. * * * It is possible to conceive that increased costs due to six-hour day and increased wages might make these rates unremunerative before the end of five years, and yet we apparently would be required to handle the business at them for as long as the government desired we should." The Assistant General Counsel of the plaintiff in a letter dated July 6, 1934, in commenting on the contract said: "I do not find in the agreement anywhere a sufficient definition of or reference to 'high dam' to make the provision intelligent. I suggest that you work this out more in detail * * *." The suggestions of the General Manager and Assistant General Counsel were not followed or adopted by the plaintiff, but the executive officers in charge of the matter left the contract unchanged as to term and as to description of the project. The present contention that the contract terminated when the work of the Mason Company was completed does not comport with the position of the General Manager and the Assistant General Counsel when the contract was being written. They executed the contract for the transportation of materials "for use in the construction of the Grand Coulee dam and power plant" with full knowledge of the scope of that description. Perhaps the contract, including the provision for the construction of the railroad by the United States, and the construction of the high dam involved too much for the plaintiff to risk tampering further with it, but signed it knowing that it might be construed to cover the high dam. This contract was executed for the defendant by the Secretary of the Interior who did not attend any of the conferences leading to the execution of it or see any of the letters or documents pertaining to it. Nothing was submitted to the Secretary except the contract. Consequently, these letters cannot be accepted as conclusive proof that the contract at the time it was signed was limited to the low dam, especially when the contract might have been made explicit by the

insertion of the one word "low" or the words of either of the letters provided the intention still existed to limit the contract to the low dam. These letters are not a part of the contract. They are a minor portion of the negotiations leading to the execution of the contract. When a contract is reduced to writing all matters of negotiation and discussion on the subject antecedent to and dehors the writing are excluded as being merged in the instrument. DeWitt v. Berry, supra; Van Ness v. Mayor, Aldermen and Board of Common Council of City of Washington, 29 U.S. 232, 7 L.Ed. 842; Nash v. Towne, 72 U.S. 689, 18 L.Ed. 527; Cohen v. New England Mutual Life Insurance Co., 7 Cir., 140 F. 2d 1. In Volume I Restatement of the Law of Contracts, Section 237, the rule is stated as follows:

"* * * the integration of an agreement makes inoperative to add to or to vary the agreement all contemporaneous oral agreements relating to the same subject-matter; and also, unless the integration is void, or voidable and avoided, all prior oral or written agreements relating thereto. If either void or voidable and avoided, the integration leaves the operation of prior agreements unaffected."

■ Attention is directed to Section 20 of the contract. This section relates to the return of the rail and fastenings to the plaintiff on the completion of the Grand Coulee dam and power plant with a proviso that if on completion thereof it appears that the United States will, within a few years thereafter proceed to increase the heighth of the dam, the plaintiff will not require the return of the rail and fastenings till the high dam is completed and with an additional proviso that if there is no decision as to the construction of the high dam within ten years, the rail and fastenings will be returned to the plaintiff. The argument is made that these provisos show the intention of the government to build a low dam and that it might later decide to increase the heighth of the dam and that, therefore, the rate contract applied to the material for the low dam only. The conclusion does not follow the premise. The section relates to the return, and the time of the return, of the equipment furnished by the plaintiff for

the railroad. This section obviously was drafted at a time when it appeared that it was advisable to begin the construction of a low dam only and that an increase in the heighth of such dam was merely a possibility. Certainly this provision would not limit the right of the government to exercise its privileges under the contract and specifications for the construction of a dam with such changes or alterations as it deemed appropriate, nor does it limit the scope of the designation "Grand Coulee dam and power plant" as used in the rate making provisions of the rate contract nor does it relieve the plaintiff of its obligations under that contract to transport the material for such dam as the government saw fit to build at Grand Coulee. At this point it should be observed that there was no delay at any time in the work of building the dam to completion after it had been commenced. There was no intermission between the completion of the first unit and the beginning of the second. The work was accelerated from the beginning to the end, with the exception of installation of generators. Funds were allotted from time to time and the entire structure was practically completed within a period of six years. Section 20 contemplated the construction of the high dam and the section as a whole is as consistent with the conclusion that the rates provided in Section 12 are as applicable to the high dam as to the low dam.

The plaintiff contends that the rate contract terminated with the completion of the work under the Mason contract which was on March 21, 1938, the date on which the work of that company was accepted. Before construction on the dam was commenced, it obviously was decided to construct the high dam in successive units in the event funds were not made available for the entire project as required. Therefore, Change Order No. 1 to Specifications 570 was prepared May 24, signed June 5, 1935, by the Secretary the purpose of which was to thicken the base and otherwise change the dimensions of the structure so as to make it more appropriate for the base of a high dam. Strange as it may seem this change order was signed forty-two days before the rate contract for the transportation of cement was signed by the Secretary. The low dam was abandoned before construction was commenced. The first cement was poured November 28, 1935.

On November 3, 1937, when the foundation for the dam was nearing completion, the defendant issued invitations for bids to finish the Grand Coulee dam and power plant. Because of the magnitude of the proposal, the contractors, Mason and associates, instead of filing a competitive bid, joined with others and submitted a bid under the name of the Consolidated Builders, Inc. The bids were opened December 10, 1937, and the contract was awarded to Consolidated Builders, Inc., February 7, 1938. The Mason contract according to its terms was to terminate April 3, 1939, but the defendant by a change order terminated its contract March 21, 1938, thus advancing the termination date by more than one year. The Consolidated Builders, Inc., immediately took charge of operations, the unused materials, the machinery and equipment, the labor force and proceeded, without interruption, under preexisting methods to complete the structure. Shipments of cement to the defendant were continued in accordance with the rate contract, shipments were made on the conventional bills of lading specifying the rates provided by the contract, and bills for freight charges were submitted and paid in the accustomed manner.

■ The rate contract imposed on the plaintiff the duty to transport from six designated Washington points to Odair cement for the Grand Coulee dam and power plant; and it was quite immaterial whether the contractor who was engaged by the government to do the work of construction was the Mason Company, the Consolidated Builders, Inc., or some other. There is nothing in the contract that precluded the government from engaging many contractors for the construction of the dam; neither is there any limitation on the right of the government to make changes in its plans and specifications for the dam. It could build a low dam or a high dam without disturbing its contractual relations with the plaintiff, provided the cement transported was for the Grand Coulee dam and power plant. There is nothing in the contract that limits its duration to the period the Mason Company was engaged in per-

forming its part of the work. Reference is made to the contract with the Mason Company in Section 13, but this section is merely a recital of a fact and imposes no obligation on either party to the rate contract. This provision was inserted at the request of the plaintiff undoubtedly as an assurance that the government and its contractor had the responsibility of constructing and operating the railroad and that the plaintiff did not.

When the change order was made June 28, 1935, abandoning the plan for the low dam and substituting therefor the foundation for the high dam, the plaintiff made inquiry whether the change would affect prospective revenues from the project; but it did not concern itself about a change in rates, the terms of the contract or a change in the description of the dam. Although the plaintiff, during the fifteen months the contract was in the course of preparation, proposed numerous and important changes, no objection was raised to the designation Grand Coulee dam and power plant.

As the foundation of the dam was nearing completion, information became known that the Bureau of Reclamation contemplated asking a reduction in rates on cement below the maximum specified in the rate contract. The observation was made by the Bureau that the rate contract expressly provided for a revision of rates by agreement of the parties, that the rates designated were "maximum", that the government had constructed the railroad and that all question of the construction of the high dam long since had been settled. During a period of approximately three years many thousands of carloads of materials had been transported to the site and the government had proceeded with the construction of the dam. During that period little or nothing, so far as appears, had been said by the parties relative to a change in rates. No contention had been made that the rate contract did not cover materials for the high dam.

### Washington Conference.

About April 1, 1938, the plaintiff commenced negotiations with the Procurement Division of the Treasury Department at Washington, D. C., for an increase in rates on materials for the high dam. A conference was held April 11, 1938, by the president and vice president of the plaintiff with H. E. Collins, Assistant Director, and W. E. Hayghe, Chief of the Traffic Section of the Division. In connection with this conference a letter [6] to the Secretary of the Interior, not dated but mailed and received in the Department of the Interior April 15,

---

6 Collins Letter:

"Treasury Department
Procurement Division
Washington

"In Reply Address
Branch of Supply
and refer to file No.

"The Honorable,
"The Secretary of the Interior.

"My dear Mr. Secretary:

"Attention is invited to contract dated November 19, 1934, between the Department of Interior and the Northern Pacific Railroad Company for the construction of a standard-gauge railroad from Odair, Washington, to the Grand Coulee Dam Site.

"Among other things, the contract provides for the application of special rates to apply on cement, lumber and cribbing moving from various points of origin to Odair, Washington, the point of interchange between the Northern Pacific and the Government constructed railroad serving the dam site. These rates, however, are limited by certain provisions of the contract to apply only on materials

used in the construction of the so-called low dam and power plant, and with the completion of that part of the work the special rates expired.

"The Bureau of Reclamation has recently entered into a new contract for the heightening of the dam which will result in the purchase of large quantities of materials, including approximately six million barrels of cement. At the present time the only rates available for application to Odair, Washington are the published commercial rates, less deductions account of land grant, which are substantially in excess of the special rates' made effective on materials used in the first phase of the work.

"Under authority of Order of the President dated April 12, 1935, this office has opened negotiations with the Northern Pacific Company for the establishment of a new scale of special rates, but definite action is being withheld pending opening of bids to cover the requirements of the Bureau of Reclamation, it being understood that whatever special rates are finally approved will apply re-

1938, was prepared by Hayghe. This letter was signed by the assistant director who testified that he signed it without reading it or knowing what was in it; and, if he had known, he would not have signed it. This letter informed the Secretary that the rate contract applied only to the materials used in the construction of the low dam, that it had expired and that under authority of the President dated April 12, 1935, negotiations had been opened with the plaintiff for establishing a new schedule of rates.

The information contained in the director's letter was relayed to the Chief Engineer at Denver in a letter [7] by L. B. Williams, Assistant Commissioner of the Bureau of Reclamation, on May 5, 1938, in which he stated that the Procurement Division had informed the Bureau that the rate contract had expired, that new rates were being negotiated with the plaintiff and that they would be higher than in the former contract.

On receipt of the Williams letter R. F. Walter, Chief Engineer, directed a letter [8] to the Commissioner of the Bureau of Reclamation May 17, 1938, in which he strongly contended that the rate contract

---

troactively on any actual shipments which may move in the meantime.

"In addition to those paragraphs of the contract having to do with freight rates, it is probable that the extension or amendment of certain other provisions of the contract may be desirable on the part of the Department, there being no provision made in the instrument for a continuation of the terms with the exception of the matter contained in Paragraph 20. This office will communicate the result of its negotiations for new special rates in order that this action may be coordinated with action taken by the Department with respect to other factors.

"Very truly yours,
"H. E. Collins
"Assistant Director."

[7] Williams Letter:
"May 5, 1938
"From: Commissioner
"To: Chief Engineer, Denver, Colorado
"Subject: Freight charges on cement, Columbia Basin Project, Grand Coulee Dam.

"1. Reference is made to your letter of April 25, on the subject above named, also to Construction Engineer's letter of April 19, together with letter dated April 15, from Mr. A. L. Wielde, Northern Pacific Railway.

"2. The Procurement Division advises that they will negotiate new rates with the Northern Pacific Railway Company to supersede those in contract No. Ilr–804, which expired with the completion of the M. W. A. K. contract. An agreement has already been reached to await award of contracts for cement for the Consolidated job to see from what mills the cement will move and then agree as to the new rates, which will be retroactive. Mr. Hayghe advises that the new rates will be somewhat higher than those in the old contract.

"3. The rate question is affected by S. 3876 introduced in the Senate by Senator Wheeler, which has been approved by the Interstate Commerce Committee. This bill proposes to do away with all Government land grant rates. Mr. Hayghe states that no companion bill has been introduced in the House, and that he does not look for favorable action at this session of Congress.

"For the Commissioner
"/s/ L. B. Williams
"Assistant Commissioner
"CC: Const. Engr., Coulee Dam."

[8] "United States
"Department of the Interior
"Bureau of Reclamation
"Customhouse
"Denver, Colorado
"Office of the Chief Engineer
"May 17, 1938.
"From Chief Engineer
"To Commissioner
"Subject: Freight charges on cement— Grand Coulee Dam—Columbia Basin Project.

"1. Receipt is acknowledged of your letter of May 6, on the above subject, enclosing for consideration and report, copy of undated letter addressed to the Secretary by the Assistant Director of the Procurement Division, Treasury Department. Reference is also made to your letter of May 5, subject, 'Freight charges on cement—Columbia Basin Project—Grand Coulee Dam,' and related correspondence.

"2. In paragraph 2 of your letter of May 5, you state that 'The Procurement Division advises that they will negotiate new rates with the Northern Pacific Railway Company to supersede those in contract No. Ilr–804, *which expired with the completion of the M. W. A. K. contract.* * * * Mr. Hayghe advises that the *new rates will be somewhat higher than those in the old contract.*' (Underscoring ours.) In the second paragraph of the letter from the

had not expired but was in full force and effect and covered the transportation of materials for the completion of the Grand Coulee dam and power plant; or in other words, that it covered not only the materials used by the Mason Company for the foundation but also the materials used or to be used by the Consolidated Builders, Inc. in the completion of the Grand Coulee dam and power plant.

It is significant that this conference was held without notice to the Secretary of the Interior or the Bureau of Reclamation and that no one representing the Interior Department was present, especially when it is remembered that the Interior Department had negotiated the rate contract with the plaintiff, was constructing the dam and had supervision of the entire project, and when it is re-

Procurement Division the statement is made that 'These rates, however, are limited by certain provisions of the contract to apply only on materials used in the construction of the so-called low dam and power plant, and with the completion of that part of the work *the special rates expired.*'

"3. The views expressed in the above quotations do not comport with the understanding reached in this office at the time the contract of November 19, 1934, was negotiated with officials of the Northern Pacific Railway Company, nor with our present construction of its terms, and this office is particularly concerned about the underscored portions of the quotations.

"4. Regarding the conclusion which has apparently been reached by the Procurement Division and representatives of the railway company that the contract of November 19, 1934 expired upon completion of the M. W. A. K. contract, the following comment is submitted. The pertinent provisions of the contract relating to this point are contained in articles 12 and 20. Article 12 provides that:

" 'The following maximum rates * * * are hereby established by the Company on cement * * * for use in construction of the Grand Coulee dam and power plant.'

Article 20 provides that,

" 'The United States shall return to the Company * * * all rail and fastenings * * * promptly on completion of the Grand Coulee dam and power plant; provided that if, on completion of the dam and power plant, it appears probable that the United States will, within a few years thereafter, proceed with the work of increasing the height of said dam, the Company will not require return of the rail and fastenings until the said high dam has been completed; and provided further that, if no decision as to the construction of the proposed high dam is reached within a period of ten years from the date of this agreement, the United States will * * * pick up and return the rail and fastenings to the Company.'

In view of the fact that decision to proceed with the construction of the base of the high dam instead of the so-called low dam was reached soon after the contract with the railway company was entered into, thus changing to some extent the assumptions upon which the contract was based, and resulting in some ambiguity in the application of certain of the provisions, it seems appropriate, in determining the proper interpretation of the contract provisions, to take into consideration the circumstances under which it was written as determining the intent of the parties when the contract was negotiated, as evidenced by the understanding of those who participated in the negotiations.

"5. The expression 'Grand Coulee dam and power plant' was intended to cover the completion of such structure as might be built at Grand Coulee prior to suspension of the work for an indefinite period. No mention is made in the contract of the so-called 'low dam' and had it been intended to confine the application of the contract to the low dam, this would have been specifically stated. There was good reason to believe, even at that time, that the work would not stop prior to completion of the high dam and power plant, and the provision in article 20 for termination of the contract upon the expiration of ten years was inserted only on the insistence of the Company's representatives. This office does not concede that the term 'Grand Coulee dam and power plant' is restricted in meaning to the so-called 'low dam,' but the work accomplished under the M. W. A. K. contract as well as the work now in progress under the Consolidated Builders, Inc. contract is all part of the construction of Grand Coulee Dam and Power Plant. Certainly no one can reasonably contend that the contract expires prior to the lapse of a period of ten years, as provided in article 20, provided the high dam has not been completed. In other words, the contract, in our opinion, expires, (a) upon completion of the high dam, or (b) ten years from the date of the agreement

membered that all the transactions of the plaintiff had been with the Bureau at Denver and none with the Procurement Division at Washington. The plaintiff had made no request of the Bureau for an increase in rates. Application was made to a different bureau of a different department in a distant city and to officers who had no information pertaining to the rate contract or the project. The plaintiff undertakes to justify its action in proceeding before the Procurement Division because of the executive action of April 12, 1935, to place traffic matters in the Treasury Department. The matter came to the hand of one W. E. Hayghe, a subordinate in the Procurement Division. The Stevens and Clark letters were presented to him and a statement made from the plaintiff's point of view whereupon Hayghe, without ascertaining the position or point of view of the Interior Department, obviously jumped to the conclusion that the contract had expired. The plaintiff relies on these letters to show the position taken by the government at the time they were written. Public officers are merely officers of the public, whose powers and authority are defined and limited by law, and any act without the scope of the authority so defined does not bind the principal, and all persons dealing with such agents are charged with knowledge of the extent of their authority. Whiteside et al. v. United States, 93 U.S. 247, 23 L.Ed. 882; United States v. Barlow, 132 U.S. 271, 10 S.Ct. 77,

---

of November 19, 1934. It is not conceded that any part of the contract can be considered as expiring before the final date of termination, and the only manner in which the rate structure can be changed is by mutual agreement in accordance with the provisions of the last seven lines of article 12. Further justification for this view will be hereinafter brought out in the discussion of the proposed rate structure.

"6. The negotiations in Denver leading up to agreement on the terms of the contract were participated in, on the part of the railroad company by Mr. R. W. Clark, Vice President in charge of traffic, Mr. J. L. Burnham, Western Traffic Manager, and Mr. B. A. Cleveland, General Freight Agent. The representatives of the Bureau, citing the construction of the Boulder City branch of the Union Pacific as a precedent, contended that the Northern Pacific should be willing to build the Grand Coulee branch line at its own expense. The point was stressed that the tremendous volume of traffic resulting from the construction of the low dam then authorized, as well as the high dam which was certain to be built, would fully justify the construction of the railroad by the Company without expense to the Government. Mr. Clark, however, refused to concede that the high dam would ever be built and insisted that the Company could not afford to build the branch line for the low dam only, and he further refused to concede that the rate structure should be based on the anticipated traffic from the high dam.

"7. In negotiating the rate structure, the Bureau representatives held out for a rate on cement from coast points of, 15¢ per hundred, on two grounds; 1st, that the tremendous volume of traffic which the railroad company would receive before the high dam was completed would fully justify this rate; second, that the rate structure should be based on the short haul of from 137 to 256 miles from West Coast cement mills to Adrian by the Great Northern, rather than on the long haul of about 465 miles by the Northern Pacific via Pasco. We insisted that this cement would never be hauled by the circuitous Northern Pacific route, but Mr. Clark was equally insistent that it would be so routed and that the freight rate should be based on the long haul. The Bureau representatives finally yielded and agreed to tentatively accept the 17¢ rate, although we were convinced that it was not equitable if the material should move via the Great Northern, and also if the work on the high dam should proceed without interruption. To protect the Government in the event that our assumptions were correct, we insisted on placing in the contract a provision for a downward adjustment of rates, which accounts for the following provision in article 12:

" 'The rates hereinabove shall not be increased or decreased during the term of this contract unless in the opinion of the United States and the Company such rates become inequitable because of changed conditions. If the necessity arises for revising said rates or for the fixing of rates on additional items or from additional points, adjustments will be made in the established rates or such new rates will be made as may be agreed to by the authorized representatives of the Company and the United States.'

It should be mentioned that the word

33 L.Ed. 346; Continental Casualty Co. v. United States, 5 Cir., 113 F.2d 284; 46 C.J. 1033. The conclusions stated in the letters were made without a hearing, without investigation, without knowledge of the subject, and without authority to change or terminate the rate contract. Collins or Hayghe or the Procurement Division had no power to alter or terminate a contract that had been executed on behalf of the defendant by the Secretary of the Interior or state a position on it that would in any way bind the United States.

The Washington Conference ended in a stalemate. The defendant contends that the plaintiff had two objectives in view: (1) To escape the rate contract on materials for the high dam so it could have the benefit of the 10% rate increase, applicable to the area, which had been allowed shortly prior to the Washington Conference, and (2) that, if the provisions of the rate contract could not be avoided, the plaintiff at least might be able to forestall the government in an effort to secure lower rates. In the second objective the plaintiff was successful.

On the failure of the Washington Conference the plaintiff in its freight bills demanded tariff rates less applicable land grant deductions. The government refused to pay such rates on the ground that the rate contract still was in effect. The plaintiff continued to perform the service and the defendant continued to pay the contract rates. In any event a new contract was

---

'decreased' was inserted at the request of the railroad officials, even though Mr. Clark positively stated that there would be no request for an increase by the railroad company.

"8. Under date of December 23, 1935, before cement shipments began to move, the Northern Pacific Railway Company addressed a letter to the Traffic Manager of the Interior Department advising that an understanding had been reached with the Great Northern whereby all cement originating at West Coast mills would be handled by the Great Northern to Adrian, thus confirming the contention which we had made that these shipments would never move by the circuitous Northern Pacific route. It is of interest to note in this connection that the Great Northern receives 45% of the 17¢ rate, or $.0765, and the Northern Pacific receives 55%, or $.0935. The length of haul over the Great Northern from West Coast mills to Adrian averages 215 miles, while the haul over the Northern Pacific from Adrian to Odair is 21.2 miles. The revenue received by the Great Northern averages $.0071 per ton-mile, while the Northern Pacific receives $.0882 per ton-mile.

"9. These figures show conclusively that there is no justification whatever for an increase in the rate of 17¢, as the revenue now received by the Northern Pacific for the haul of 21.2 miles from Adrian to Odair is out of all proportion to the cost of this service, as well as to the division of the revenue received by the Great Northern. When the further circumstances above mentioned are considered, namely, that the branch railroad from Odair to the dam was constructed at the expense of the Government, with

the exception of the loan of rail and fastenings, and that the construction of the high dam with the tremendous amount of traffic resulting therefrom, will be prosecuted without delay, there is every justification for demanding that the present rate of 17¢ per hundred from coast mills be reduced, and that a corresponding adjustment be made in the rates from the two Eastern Washington mills.

"10. This office does not have a copy of the Executive order dated April 12, 1935 which is cited by the Procurement Division as authority for opening the negotiations with the Company, but it would appear that the contract of Nov. 19, 1934, having been executed on behalf of the United States by the Secretary of the Interior, cannot properly be terminated or amended except by the same official. However, if the Procurement Division is charged with the responsibility of handling these negotiations, it is recommended that strong representations be made to that office that:

"(a) There is no justification for concluding that the contract of Nov. 19, 1934, has expired; and

"(b) That no upward adjustment of freight rates for cement or other materials for Grand Coulee Dam be considered, but on the contrary that a reduction in the present 17¢ rate from the West Coast mills to Odair to 15¢ per hundred be demanded, with a corresponding reduction in the rates from Eastern Washington points.

"R. F. Walter

"In dupl.

"cc: Const. Engr., Coulee Dam, Wash. "DC, Portland, Ore."

not made and the parties proceeded under the terms and conditions of the old.

### Kenney Telegram.

The telegram [9] of W. P. Kenney, President of the Great Northern to a Vice President in charge of traffic dated March 17, 1938, is significant in connection with the duration of the rate contract. It was sent at the time of the rate agitation just prior to the Washington Conference. The Mr. Donnelly mentioned in the telegram was President of the plaintiff. It shows that the Presidents of the roads had an "understanding" which the President of the Great Northern "thought covered the cement movement to Grand Coulee on everything that moves." He further stated that he "did not know there was any necessity for making a new agreement." This had reference to the effort to negotiate a new rate contract at the Washington Conference. Furthermore, he stated that he and Mr. Donnelly agreed "on the rate and divisions in connection with building of road over to Grand Coulee Dam and I don't think there will be any misunderstanding regarding it." These poignant statements show that when the companies made their agreement October 1, 1934, the President of the Great Northern at least believed that the rate contract applied to "everything that moves," and that "a new agreement was not necessary." Clearly there was no idea in the mind of the President of the Great Northern that the rate contract covered cement for the low dam only.

### Equities.

The law does not protect against conditions, harsh though they may be, which a party to a contract voluntarily has imposed on himself. Transcontinental & Western Air, Inc., v. Parker, 8 Cir., 144 F.2d 735; Tahir Erk v. Glenn L. Martin Co., 4 Cir., 143 F.2d 232; Shell Oil Co., Inc.,

v. Manley Oil Corporation, 7 Cir., 124 F.2d 714; Summers v. Travelers Insurance Co., 8 Cir., 109 F.2d 845. It is not the function of the court to make a new contract for the parties. Columbia Gas Const. Co. v. Holbrook, 6 Cir., 81 F.2d 417; Order of United Commercial Travelers v. Shane, 8 Cir., 64 F.2d 55; O'Connor v. Great Lakes Pipe Line Co., 8 Cir., 63 F.2d 523. But, if there is a question of interpretation, the court should endeavor to adopt the construction which is most equitable to the parties and will not give to one of them an unreasonable advantage over the other; in other words, where a contract is capable of an interpretation in accordance with justice and fair dealing the court will adopt such construction. Phillips Petroleum Co. v. Gable, 10 Cir., 128 F.2d 943; Bayne v. United States, 8 Cir., 195 F. 236; Champlin v. Commissioner, 10 Cir., 71 F.2d 23; Foye Lumber Co. v. Pennsylvania Railroad Co., 8 Cir., 10 F.2d 437; Leschen & Sons Rope Co. v. Mayflower Gold Mining & Reduction Co., 10 Cir., 173 F. 855, 35 L.R.A.,N.S., 1; City of Orlando v. Murphy, 5 Cir., 84 F.2d 531.

To adopt the construction of the contract advocated by the plaintiff, namely, that the termination of the Mason Contract by the government on March 21, 1938, and the acceptance of the work done under it, automatically terminated the special rate contract would give the plaintiff a position of decided advantage and place the defendant in a predicament. At that time only the foundation of the Grand Coulee dam and power plant had been constructed. The government had five thousand employees engaged on the work, a vast quantity of materials on hand and on order, had expended a million dollars on the construction and operation of a branch railroad which had to be junked on completion of the dam, was holding aside the waters of a tremendous river and was ready to proceed

---

9 "Phoenix, Ariz. March 17, 1938
"Mr. F. R. Newman:
 "Yours 9th with copy of memorandum regarding conversation with Mr. Clark of the Northern Pacific on matter of cement rates to Grand Coulee.
 "Mr. Donnelly and I had an understanding that I thought covered the cement movement to Grand Coulee on ev-

erything that moves and I did not know there was any necessity for making a new agreement. He and I agreed on the rate and divisions in connection with building of road over to Grand Coulee Dam and I don't think there will be any misunderstanding regarding it.
 "W. P. Kenney"

with the work to completion when it was notified through the Procurement Division at Washington that the special rate contract had expired and that a new contract providing for higher rates was necessary, or that tariff rates less land grant deductions would be exacted.

The reasons why the plaintiff is one of the greatest benefactors of this public improvement and the advantages of the rate contract to the plaintiff have been stated but certain other facts should have attention in connection with the interpretation of the rate contract. On the negotiation of this contract, the plaintiff entered into division agreements with its connecting lines, the Great Northern and the Milwaukee. When these divisions are considered with the service rendered by the respective carriers, the bonanza held by the plaintiff may be more clearly understood.

The agreement with the Great Northern provided for a division of 55% of the revenue to the plaintiff and 45% to the Great Northern on the shipment of cement from the West Coast mills to Odair. The Great Northern transported this cement from the West Coast mills over the mountains to Adrian, an average distance of 235 miles. The plaintiff transported the cement from Adrian to Odair a distance of 21.2 miles where it was delivered to the government contractor. The plaintiff performed 9% of the service and the Great Northern 91%. Of the 17¢ per cwt., the plaintiff received 9.35¢ and the Great Northern 7.65¢. The plaintiff received 1.70¢ per cwt. more for performing 9% of the service than the Great Northern received for performing 91% of it. The shipments from the West Coast mills totaled 36,742 carloads on which the government paid freight of $5,461,580.-50, producing to the Great Northern average ton mile earnings of $.00653 and to the plaintiff $.08905 or 12.7 times as much to the latter as to the former.

An agreement with the Milwaukee provided for two-thirds of the revenue to the plaintiff and one-third to the Milwaukee on shipments from Metaline Falls. The Milwaukee transported the cement from Metaline Falls to Spokane or Rathdrum where it was received by the plaintiff and transported to Odair. The Milwaukee performed 51% of the service and of the 17¢ per cwt. received 5.667¢ to Spokane or 4.658¢ to Rathdrum while the plaintiff received 11.-333¢ if the exchange was at Spokane or 12.342¢ if at Rathdrum. Freight on shipments from Metaline Falls amounted to $932,689.

Approximately thirteen thousand carloads of materials other than cement were shipped from various parts of the country at tariff or land grant rates on which the government paid freight of $2,263,869.71. On all these shipments the government favored the lines of the plaintiff where possible. Shipments of cement from Trident and Portland were made in 1939 because the western mills were unable to supply the volume required by the government. The special rate contract did not apply to these points of origin and land grant rates were paid. Freight on 423 carloads from Trident amounted to $78,031.72 and on 1,335 carloads from Portland the freight was $404,323.21.

The plaintiff's revenue per car on cement from Adrian to Odair in the years 1935 to 1939 ranged from $88.43 to $96.47 and on this service the plaintiff calculated its "out-of-pocket" cost at $3.75 per carload. An important factor, of course, was the movement of the freight by the plaintiff a distance of only 21.2 miles.

The valuation placed on the patronage resulting from the construction of the dam by the Great Northern and the Milwaukee is revealed by the willingness of the one to accept 45% of the pay for 91% of the service and of the other to accept one-third of the pay for 51% of the service. The connecting lines furnished a proportionate part of the freight cars used for the transportation of materials. The government paid all of the cost of installing and 65% of the cost of operating the interchange facilities at Odair. Obviously there were strong reasons why the executives of the plaintiff did not insist on the description of the dam in the rate contract being changed to cover the low dam in explicit terms.

It may be said that the terms of the division contracts between the carriers was their own business and of no concern to the defendant; yet, these facts elucidate a situation involving equities of the respective parties herein that the court

may take into consideration in its effort to arrive at a fair interpretation of the contract. On the question of construction, the plaintiff is not entitled to claim special favors, especially as the evidence is as cogent that the contract covered the cement for the high dam as it is that it applied to the low dam only. The rule in 17 C.J.S., Contracts, § 318, p. 735 may be applied.

"Where a word or words, or the contract as a whole, is susceptible of two meanings, one of which will uphold the contract or render it valid or enforceable, while the other will destroy it or render it invalid or ineffective, the former will be adopted. So, a contract should be construed in favor of mutuality, certainty, and legality; and a construction imputing good faith and absence of fraud, or rendering performance possible, will be preferred to a contrary construction."

### Fraud.

It is asserted that the government was induced by the misrepresentation and fraud of the plaintiff to execute the rate contract. This argument certainly is inconsistent with plaintiff's contention that the contract is valid and applicable to the transportation of the cement from the Washington mills for use in construction of the entire dam. Furthermore, the issue is presented at a late hour. After what has been said, an analysis of the evidence bearing on the question of fraud is unnecessary and this phase of the controversy requires only brief attention.

 It is well settled that to constitute actionable fraud the injured party must have had the right to rely on the representations or concealments alleged to have been made. A party may not rely on another to disclose superior information which the latter may possess, in the absence of confidential relations. Roosevelt v. Missouri State Life Insurance Co., 8 Cir., 78 F.2d 752; Upton v. Tribilcock, 91 U.S. 45, 23 L.Ed. 203; Horton et al. v. Reynolds et al., 8 Cir., 65 F.2d 430; Slaughter's Adm'r v. Gerson, 13 Wall. 379, 20 L.Ed. 627; 37 C.J.S., Fraud, § 30, p. 271.

In the Roosevelt case, supra [78 F.2d 762], Judge Sanborn in a concurring opinion said:

"This court, however, has long been of the view that in actions to recover damages for fraud, the misrepresentations must not only have been relied upon, but must have been of such a nature or made under such circumstances that the plaintiff had a right to rely upon them."

In Restatement of the Law of Torts, Section 546, the rule is stated as follows:

"The maker of a fraudulent misrepresentation in a business transaction is liable for pecuniary loss caused to its recipient by his reliance upon the truth of the matter misrepresented if his justifiable reliance upon the misrepresentation is a substantial factor in determining the course of conduct which results in his loss."

 The Denver Conference was a bargaining negotiation. One witness designated it a "horse trading affair." Many offers and counteroffers were made. The participants were intelligent, experienced men of affairs, dealing at arm's length with each other. There was nothing in it indicating fiduciary relations. The evidence shows that each side had much data on the subjects under consideration. While the representatives of the government were not railroad experts and were "in a hurry to get started", they could have called for conference agents of the Great Northern, the Milwaukee, and the Union Pacific. They could have called to their aid the employees of the Interstate Commerce Commission, the Public Service Commission of Washington, and the experts of the General Accounting Office, "a court of last resort" on the calculation of land grant rates. They could have had full and complete information pertaining to the routes, the Adrian gateway, the cost of service, what would have been fair and reasonable rates and all other information and facts that would have been helpful. The relations of the parties were not such as to excuse investigation and justify reliance on information coming from parties representing adverse interests. Consequently, the United States is precluded from asserting fraud in this case for the simple reason that its representatives had no right under the circumstances to rely on what was said by the agents of the plaintiff in the

Denver Conference and in subsequent negotiations. Therefore, fraud is not a basis for a cause of action, a defense or a counterclaim by the defendant against the plaintiff in this case; neither was the rate contract vitiated by fraud.

It may be appropriate to add that the government became fully aware of the facts several years prior to the completion of the dam; and, if it considered that it had been defrauded or that the contract rates were unreasonable, it could have proceeded before the Interstate Commerce Commission in interstate matters and before the Public Service Commission of Washington in intrastate matters to secure a reduction. However, as this court holds the rate contract applicable to the transportation of all the cement from the six Washington points for the dam as constructed, it is unnecessary to determine the question of jurisdiction to fix rates. See Watab Paper Co. v. Northern Pacific Railway Co., 8 Cir., 154 F.2d 436; Thompson, Trustee et al. v. Baltimore & Ohio Railroad Co. et al., 8 Cir., 155 F.2d 767; Great Northern Railway Co. et al. v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943; Mitchell Coal & Coke Co. v. Pennsylvania Railroad Co., 230 U.S. 247, 33 S. Ct. 916, 57 L.Ed 1472; Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed 553, 9 Ann. Cas. 1075; Belcher v. Tacoma Eastern R. Co., 99 Wash. 34, 168 P. 782; Hewitt Logging Co. v. Northern Pacific Railway Co., 97 Wash. 597, 166 P. 1153, 3 A.L.R. 198; State v. Metaline Falls Light & Water Company, 80 Wash. 652, 141 P. 1142; Northern Pacific Railway Company v. Sauk River Lumber Co., 9 Cir., 82 F.2d 519.

For several years both parties carried on operations under the rate contract without complaint; in fact till one party wanted an increase in rates and the other wanted a reduction. For an additional period of five years both continued operations in accordance with the terms of the contract. Except the filing of this suit on November 4, 1939, no action was taken by either party.

### Rescission.

■ The defendant claims the right to rescind the rate contract. Rescission is the termination or the unmaking of a contract. A voidable, executory contract may be rescinded on proper grounds. However, a contract which is fully executed cannot be rescinded. Merchants' Bank v. Hanna, 8 Cir., 73 F.2d 818. One claiming that a contract was obtained by fraud, promptly must elect to rescind or be denied that relief on the ground of ratification. If one proceeds to execute the contract, or receive the benefit under it, knowing that he is being defrauded, or if he in any way recognizes it as a subsisting and binding agreement, he will be deemed to have affirmed the contract and waived his right to rescind.

■ A right to rescind must be exercised within a reasonable time after discovery of the facts from which the right arises. Brite v. W. J. Howey Company, 5 Cir., 81 F.2d 840; Nelson v. Chicago Mill & Lumber Corporation, 8 Cir., 76 F.2d 17, 100 A.L.R. 87.

■ Generally an affirmative act on the part of one desiring to rescind is necessary. Andrew v. American Sav. Bank & Trust Co., 219 Iowa 921, 258 N.W. 911; Mannon v. Pesula, 59 Cal.App.2d 597, 139 P.2d 336; Huth v. Picotte, Mo.App. 154 S.W.2d 382.

■ In this case the defendant at no time gave notice of intention to rescind but proceeded for a long period of time under the contract. Indeed, the Chief Engineer of the Bureau of Reclamation in charge of the Denver office on May 17, 1938, three years after the contract had been signed in a letter to the Commissioner of the Bureau strongly contended that the contract was still in force and effect. Throughout the operations to the end of 1942 the contract was treated as a subsisting and binding obligation. The contract has been substantially performed in all respects. This case was presented by the defendant on the theory that the contract covers the transportation of materials for the dam as completed; consequently, there is no ground for rescission.

### Reformation.

■ The defendant seeks a reformation of the contract. Reformation is an equitable remedy by which a written instru-

866

ment is made or construed to express the real intention of the parties when some error or mistake has been committed. Equity has power to reform and correct a valid written instrument to make it conform to the agreement actually made. A proceeding to reform a contract presupposes that the instrument does not express the true intent of the parties. It contemplates a continuance of the contractual relation. Its purpose is not to make a new contract but to give effect to the original intent of the parties. Cramp & Sons Ship & Engine Bldg. Co. v. United States, 239 U.S. 221, 36 S.Ct. 70, 60 L.Ed. 238; Bartelme et al. v. Merced Irrigation District, 9 Cir., 31 F.2d 10.

Where reformation is sought because of the mistake of one party only, it is essential that fraud be found in the other and that the fraud was perpetrated to induce the making of the contract, and, although a ground for rescission and cancellation, it is not a ground for reformation. Where because of ignorance or mistake on one side and fraud on the other the contract does not accurately state the agreement made, its reformation may be authorized. Columbian National Life Insurance Co. v. Black, 10 Cir., 35 F.2d 571, 71 A.L.R. 128; Westinghouse Electric & Mfg. Co. v. Tri-City Radio Electric Supply Co., 8 Cir., 23 F.2d 628; Southern Surety Co. v. United States Cast Iron Pipe & Foundry Co., 8 Cir., 13 F.2d 833.

In this case there is no ground for reformation because the written contract fully and accurately expressed the agreement made by the parties and, in fact, there is no contention to the contrary. Moreover, the contract has been substantially terminated by performance.

Bill of Lading Provision.

The government bills of lading for shipment of the cement from the Washington mills to Odair had stamped thereon "Special rate of 17¢ cwt. per contract Ilr-804 with the Northern Pacific Railway dated August 7, 1935." The government contends that acceptance of shipments on such bills created a contract for carriage at the 17¢ rate even if the special rate

contract had expired. The acceptance of the shipments on bills bearing that notation was not an agreement to the rate, or acquiescence in the rate or a waiver of objections to it. The performance of such service by a common carrier cannot be construed as a waiver of its rights or consent to an obligation that otherwise does not exist under the law or a contract. Chicago & Northwestern Railway Company v. United States, 104 U.S. 680, 26 L.Ed 891. The government was advised of the plaintiff's position and was not mislead or deceived in any way by the action of the plaintiff in accepting the shipments on the bills of lading bearing the notation. At the time the shipments involved herein were made, the United States was engaged, at the height, in the construction of the dam and refusal to transport the shipments immediately would have interfered with the progress of the work and have resulted in heavy loss to all parties concerned. The plaintiff should have rendered the service, as it did, and leave to an appropriate tribunal the responsibility of determining rate and contractual disputes.

Freight bills were submitted on usual forms for tariff rates less land grant deductions. These bills were allowed by the defendant at contract rates and the plaintiff received the money. A bill for the full sum claimed was presented to the appropriate officer and a portion was deducted. The plaintiff did not indicate satisfaction with the sum allowed. No action or omission of the plaintiff induced the making of the deduction. Acceptance of the sum allowed is not a bar to a claim for the balance in the courts of proper jurisdiction. St. Louis, B. & N. Ry. v. United States, 268 U.S. 169, 45 S.Ct. 472, 69 L.Ed. 472.

Conclusions.

The Grand Coulee dam and power plant is a magnificent monument to the ability, energy, and ingenuity of R. F. Walter, Chief Engineer, S. O. Harper, Assistant Chief Engineer, and Frank A. Banks, Construction Engineer. This structure was substantially completed in a period of six years, and the hydroelectric plant was placed in operation in time to supply current to extensive war industries. The

Columbia Basin Project is nearing completion and will be a lasting benefit to the people of the Northwest area. The economic success of the enterprise is assured.

The rate contract has been performed. When it was executed, the parties knew that the high dam was under construction. It was valid and applicable to the movement of cement from the six Washington mills to Odair for the dam as constructed. Furthermore, there was no provision in the contract limiting it to the low dam or its duration.

The plaintiff and its connecting carriers transported the cement, delivered it to the government's contractor and were paid as the contract provided, and, this includes the shipments covered by the bills of lading on which this suit is based; in other words, the plaintiff has performed its part of the contract, has received contract rates for its service on shipments covered by the contract and on all other shipments it has been paid tariff rates less applicable land grant deductions.

As the validity and applicability of the contract to the dam as constructed are sustained, the plaintiff is not entitled to recover on its alleged cause of action, and the defendant is not entitled to recover on any of its alleged counterclaims. Thus the court leaves the parties where it found them, which, in all fairness and justice, is precisely what each is entitled to receive in this suit.

Findings of Fact, Conclusions of Law, and an Order for Judgment will be entered accordingly.